**WO**                          NOT FOR PUBLICATION

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Lori Bell, | No. CV-14-01916-PHX-JJT |
| Plaintiff, | **ORDER** |
| v. | |
| VF Jeanswear LP, *et al.*, | |
| Defendants. | |

At issue are the following Motions: Defendant VF Jeanswear LP's Motion for Summary Judgment (Doc. 79, Def.'s MSJ), to which Plaintiff Lori Bell filed a Response (Doc. 93, Pl.'s Resp.), and Defendant filed a Reply (Doc. 97, Def.'s Reply); and Plaintiff's Motion for Partial Summary Judgment on Unpaid Commissions Due to Her (Doc. 81, Pl.'s MSJ), to which Defendant filed a Response (Doc. 88, Def.'s Resp.) and Plaintiff filed a Reply (Doc. 96, Pl.'s Reply). Plaintiff also filed a Supplemental Memorandum in Opposition to Defendant's Motion for Summary Judgment (Doc. 105), to which Defendant filed a Response (Doc. 106). The Court finds these matters appropriate for resolution without oral argument. *See* LRCiv 7.2(f). For the reasons that follow, the Court grants in part and denies in part Defendant's Motion for Summary Judgment and denies Plaintiff's Motion for Partial Summary Judgment on Unpaid Commissions Due to Her.

## I.    BACKGROUND

The following facts are undisputed unless otherwise indicated. Plaintiff Lori Bell, a female who was 47 years old in 2014, brings employment-related claims against her

prior employer, Defendant VF Jeanswear LP. Defendant manufactures and sells apparel, including Wrangler brand jeans and apparel, and its Western Specialty division sells Wrangler brand apparel to Western Specialty retail stores and companies. Plaintiff alleges Defendant discriminated against her and constructively discharged her by forcing her to resign on February 28, 2014. Defendant argues Plaintiff voluntarily resigned and was not constructively discharged.

Plaintiff alleges Defendant discriminated against her on the basis of sex pursuant to Title VII of the Civil Rights Act of 1964 (Title VII), as amended 42 U.S.C. § 2000e *et seq.*, and age pursuant to the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq.* (Doc. 31, Am. Compl. at 1.) Plaintiff also alleges Defendant failed to pay her equal wages and retaliated against her in violation of the Equal Pay Act (EPA), 29 U.S.C. § 206(d), and Fair Labor Standards Act (FLSA) 29 U.S.C. § 215(a)(3). (Am. Compl. at 1, 7–8.) Finally, Plaintiff claims Defendant violated the Arizona Wage Act (AWA), A.R.S. § 23-350 *et seq.*, by failing to pay wages due. (Am. Compl. at 1.)

**A.    Defendant's Employment Structure and Employee Compensation**

Defendant's business is, in part, comprised of several sales-related units. Sales representatives in Defendant's Western Specialty division are called Field Sales Representatives (FSRs) and Account Executives (AEs). In 2007, the Western Specialty division had AEs assigned to the following customer retailers: Baskins, Boot Barn, BTWW, Cavender's, Drysdales, Sheplers and RCC. FSRs and AEs engage in similar activities including selling products, supporting and executing marketing initiatives, communicating with customers, facilitating orders, and maintaining sales plans. AEs, however, typically work with a larger volume of sales, have greater responsibility, and manage major strategic accounts. FSRs are assigned to existing geographic territories with an existing account base and sales revenue. They are also obligated to actively pursue new accounts. The FSRs' geographical territories exclude certain large retail accounts assigned to AEs who handle those accounts.

1       At the beginning of every year, Defendant's employees are given a "pay plan" that

2 establishes their target compensation for the calendar year, and which, once finalized, is

3 retroactive to the beginning of that year. Target compensation is comprised of base salary

4 and commissions; in general, base salary makes up 50 to 70 percent of target

5 compensation. Target compensation for all sales representatives is not formulaic, but

6 rather, based on several factors, including experience with Defendant, overall sales

7 experience, volume of sales representatives' account or territory, level of responsibility,

8 and job performance. Target compensation for FSRs and AEs is based on their actual

9 sales from the prior year; if the salesperson meets the same sales totals he or she made in

10 the prior year, he or she will be paid the target compensation for the year. Generally, AEs

11 make more money than FSRs.

12     **B.**    **Plaintiff's Roles with Defendant**

13       Blue Bell, Defendant's predecessor company, hired Plaintiff in 1985.[1]  Defendant

14 contends that while working there, Plaintiff obtained only six years of sales experience,

15 but Plaintiff contends her entire career with Defendant, some 24 years, was in sales in

16 some form. Plaintiff's first position with Defendant was in retail productivity

17 management (RPM). In this sales support role, Plaintiff's responsibilities included

18 tracking merchandise inventory for stores, transmitting that information to Defendant,

19 generating orders, and developing business and inventory models based on analysis of

20 sales data. Plaintiff was promoted to an RPM management position, became a retail space

21 management (RSM) manager approximately five years later, and then held the position of

22 RSM supervisor from 2000 to 2007. Although RSM employees are not trained to become

23 sales representatives and RSM positions are not characterized as training positions,

24 Defendant's Vice President of Sales, Allen Montgomery, its Regional Manager of Sales

25 for the Western Accounts Group, Wayne Larson, and its District Sales Manager,

26

27       [1] The Court acknowledges Plaintiff initially worked for Blue Bell and later, after taking maternity leave, began working for VF Jeanswear LP as Blue Bell's successor. For the purpose of the current Motions, the Court does not distinguish between Blue Bell and VF Jeanswear LLP and considers Plaintiff's employment with Defendant to extend back to the time she was employed with VF Jeanswear LP's predecessor, Blue Bell.

28

1    Bob Bader testified that the company looks to that group of employees to promote people
2    into territory sales.

3    In 2007, Defendant made Plaintiff an AE for the Wrangler account, and she was
4    responsible for selling Wrangler products to Boot Barn stores. Plaintiff held that position
5    until the end of her employment with Defendant. Mr. Larson supervised Plaintiff in this
6    role, and he reported to Vice President of Sales, Mr. Montgomery.

7    From 2010 to 2013, Plaintiff had positive work evaluations as an AE. Her
8    supervisors characterized her work as "strong," the second highest rating one can receive.
9    Lory Merritt, who also worked as an AE on the Boot Barn account, described Plaintiff's
10   performance positively, specifically regarding her ability to build relationships. Laurie
11   Grijalva, Boot Barn's Vice President of Buying and Merchandising, also gave positive
12   comments about Plaintiff's work.

13   **C.    The Boot Barn Account's Growth and Defendant Employees' Roles on
14          the Boot Barn and Other Accounts**

15   When Plaintiff started as an AE for the Boot Barn account in 2007, the account
16   consisted of 36 stores; by early 2014, it had grown to approximately 160 stores.
17   Significant growth occurred when Boot Barn acquired approximately 100 stores, all of
18   which had pre-existing accounts with Defendant that AEs other than Plaintiff managed.
19   Specifically, in 2008, Boot Barn acquired 45 stores from the company BTWW, which
20   Mr. Merritt had managed as AE. In January 2009, Mr. Merritt joined Plaintiff as an AE
21   on the Boot Barn account. In 2013, Boot Barn acquired 30 stores from the company
22   Baskins. Travis Barker was the AE for Baskins, and Mr. Barker joined as a third AE for
23   the Boot Barn account after its acquisition of the Baskins stores.

24   After the acquisitions, supervisors Mr. Larson and Mr. Montgomery designated
25   Mr. Merritt as account manager and lead for Boot Barn. Mr. Merritt and Plaintiff worked
26   as equal partners in growing the business of the account, however, and they equally
27   shared commissions based on the account's total volume. Mr. Merritt also stated that on a
28   day-to-day basis, they worked together on everything. As lead, Mr. Merritt had several

additional responsibilities including handling financials and "top-to-top" meetings between top Defendant and Boot Barn executives. Plaintiff also took part in top-to-top meetings and contends she was as involved as Mr. Merritt in other strategic endeavors.

As part of the sales-related services, employees were responsible for providing sales analysis to customers for managing inventory and forecasting demand. Specifically, Plaintiff and the other AEs received weekly emails from Boot Barn with an Excel document of sales data that the AEs and other employees used to prepare sales analysis for Boot Barn. On several occasions, Ms. Grijalva expressed to management that it needed to provide her and Boot Barn with better sales analysis, suggesting the account needed an AE with more analytical skills.

### D.    Defendant's Personnel Changes and Plaintiff's Response

In 2014, as Boot Barn acquired more retail stores and senior level management, Mr. Barker and Mr. Merritt, anticipated retiring, Defendant made changes to its personnel devoted to various sales accounts. Mr. Montgomery and Mr. Larson decided to move Plaintiff to the Arizona territory FSR position and Aaron Taylor, who was 27 years old and previously an FSR, to an AE position for Cavender, another large account. Doug Naylor, who was 36 years old and an AE on the Cavender account since around 2009 or 2010, took Plaintiff's position as an AE on the Boot Barn account. Defendant characterizes the change in Plaintiff's position as a reassignment, but Plaintiff characterizes it as a demotion. Defendant contends Mr. Naylor was moved to the Boot Barn AE position because of his superior analytical abilities, which Plaintiff acknowledged she lacked and Boot Barn's growing business required. In his deposition, Mr. Larson stated that a move from an AE to a FSR position would be considered a demotion and that he had never made such an employment change before. Mr. Montgomery also stated that it was reasonable for Plaintiff to consider the change a demotion.

Mr. Larson met with Plaintiff on January 14, 2014, to inform her of the personnel changes. One day after this meeting, Mr. Larson sent an email to Mr. Montgomery stating

"I did not approach her [Plaintiff] as if this were a proposal, but a directive and a done deal. She is in denial. This will probably get interesting." (Doc. 94, Plaintiff's Controverting Statement of Facts and Additional Material Facts (PSOF), Ex. 5, Dep. Ex. 21.) Mr. Montgomery stated Plaintiff was not given an opportunity to provide input to the change in her position.

After Plaintiff's meeting with Mr. Larson, Plaintiff spoke with Mr. Montgomery regarding the change in her position. In his deposition, Mr. Montgomery stated he had thought Plaintiff might quit and would be upset when notified of the change in her position, but he believed she would eventually accept the FSR position. He told Plaintiff that her targeted income would not change for 2014, but beyond that he could not provide any further salary assurances. Mr. Montgomery also stated he told Plaintiff that the company needed individuals who could analyze data in order to grow the Boot Barn business. He testified he believed Plaintiff did not have the data analysis skills required for Defendant's major accounts going forward. On January 15, 2014, Plaintiff sent an email to Mr. Montgomery, which he shared with Mr. Larson, requesting that she be made an AE on the Cavender account rather than an FSR. Plaintiff was told at the January 14 meeting that Mr. Taylor would be the AE on the Cavender account, and the Human Resources department maintained that there were no lateral positions for Plaintiff.

Ms. Grijalva testified that she spoke with Mr. Montgomery about Defendant's personnel changes on the Boot Barn account. She asked him why Plaintiff could not stay on the account instead of Mr. Barker, to which he responded "he didn't feel comfortable putting [Plaintiff] into workwear. He thought that Travis Barker, having experience from the Baskins workwear-related accounts, would be better at workwear and that he felt a male would be better to service workwear at the time." (PSOF, Ex. 11, Grijalva Dep. at 126.) She further stated that Mr. Montgomery conveyed to her that he thought Mr. Barker would generally be a better fit and there was no room for Plaintiff on the account. Ms. Grijalva expressed her disappointment to Mr. Montgomery about losing Plaintiff and viewed the change as a demotion for Plaintiff.

After requests for a response from Plaintiff as to whether or not she would accept the FSR position, on February 13, 2014, Mr. Montgomery sent Plaintiff a letter requesting that she provide her response no later than February 28, 2014; otherwise, he would conclude she voluntarily resigned. The letter offered Plaintiff more time to consider the decision, but stated Defendant would stop her pay on February 21, 2014.

Defendant contends that during the six week period from January 14 through February 28, 2014, other than her conversation with Mr. Montgomery, Plaintiff did not ask anyone else for information about the FSR position. Plaintiff disputes this and states she spoke with Mr. Merritt, Nancy Himmel (a previous supervisor when she worked in RSM), Sam Tucker (in Human Resources), Ms. Grijalva and Shane Lord (woman's apparel buyer for Boot Barn) about her situation, but that no one offered additional information about the FSR position. Plaintiff did not contact Mr. Bader, who would have been her supervisor in the FSR position, and he did not contact her. On February 28, 2014, Plaintiff sent Defendant her resignation letter. She stated she felt "compelled" to resign because the company's "discriminatory and unfair acts" had created "an intolerable work environment."

Plaintiff and Defendant dispute whether, prior to the change of Plaintiff's position in January 2014, she had complained to Defendant management that she was being unfairly compensated compared to other AEs or treated differently because of her sex and or age. Plaintiff did not make such a complaint to Mr. Montgomery, but contends she previously complained to Mr. Larson, Ms. Himmel, and Mr. Merritt about her pay. Plaintiff stated that when she asked Mr. Larson if she was being paid equally to her peers, who were men, Mr. Larson did not directly respond. Around 2007, Plaintiff also told Mr. Merritt she believed she was not paid the same as her male AE counterparts, but he does not recall her complaints relating to sex. Plaintiff never complained to anyone in Human Resources about her compensation.

1          **E.      Plaintiff's Relationship with Mr. Larson**

2          Plaintiff states that prior to her meeting with Mr. Larson, she felt he had mistreated

3    her, harassed her, and made her feel degraded, but she never made any complaints to

4    Human Resources. Plaintiff stated Mr. Larson would become very angry at her over

5    minor expenses she incurred, dismiss her contributions in meetings, and respond to her in

6    an aggressive manner, only to reach out to her shortly thereafter and apologize. Plaintiff

7    stated that Ms. Grijalva and Mr. Lord expressed to her that some of Mr. Larson's conduct

8    toward her during meetings was inappropriate, but Ms. Grijalva stated she never heard

9    him make any inappropriate comments.

10         Plaintiff also states that Mr. Larson's comments to her at the January 14 meeting

11   were inappropriate. She stated he commented that it was great to see young energy in the

12   company, referring to Mr. Naylor and Mr. Taylor, rather than "gray hairs like you and I."

13         **F.      Defendant Employees' Compensation in Various Roles**

14         Employees in the FSR position for the Arizona territory made less money than the

15   $113,953 Plaintiff made as an AE in 2013. In 2013, Aaron Taylor made $79,760, and in

16   2015, Shannon Whaley, who assumed the Arizona FSR position, made $82,000. In 2014,

17   the Arizona territory had approximately 40 Defendant customers, almost all of which had

18   less than $100,000 in annual sales, with the largest accounting for about $800,000 in

19   annual sales for its eight stores. Mr. Bader testified that growth in the Arizona market

20   was limited, largely because pre-existing Defendant accounts were off limits and getting

21   new accounts was not common. Defendant contends that Boot Barn's 2013 sales were

22   $18.3 million. Plaintiff states that in early 2014, Boot Barn's annual sales were

23   approximately $26.6 million.

24         Mr. Naylor's target compensation was changed from $113,300 to $138,000 when

25   he moved to AE on the Boot Barn account. Defendant also later added another Boot Barn

26   AE, Joseph Tomeu, who previously worked as an FSR in Florida, and prior to that, did

27   not work in clothing sales.

28

1    Defendant now moves for summary judgment as to Plaintiff's discrimination and

2    wage claims against it, and Plaintiff moves for summary judgment as to her claim for

3    unpaid wages against Defendant.

4    **II.    LEGAL STANDARD**

5    Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is

6    appropriate when: (1) the movant shows that there is no genuine dispute as to any

7    material fact; and (2) after viewing the evidence most favorably to the non-moving party,

8    the movant is entitled to prevail as a matter of law. Fed. R. Civ. P. 56; *Celotex Corp. v.*

9    *Catrett*, 477 U.S. 317, 322–23 (1986); *Eisenberg v. Ins. Co. of N. Am.*, 815 F.2d 1285,

10   1288–89 (9th Cir. 1987). Under this standard, "[o]nly disputes over facts that might affect

11   the outcome of the suit under governing [substantive] law will properly preclude the

12   entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

13   A "genuine issue" of material fact arises only "if the evidence is such that a reasonable

14   jury could return a verdict for the non-moving party." *Id.*

15   In considering a motion for summary judgment, the court must regard as true the

16   non-moving party's evidence if it is supported by affidavits or other evidentiary material.

17   *Celotex*, 477 U.S. at 324; *Eisenberg*, 815 F.2d at 1289. The non-moving party may not

18   merely rest on its pleadings; it must produce some significant probative evidence tending

19   to contradict the moving party's allegations, thereby creating a question of material fact.

20   *Anderson*, 477 U.S. at 256–57 (holding that the plaintiff must present affirmative

21   evidence in order to defeat a properly supported motion for summary judgment); *First*

22   *Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968).

23   "A summary judgment motion cannot be defeated by relying solely on conclusory

24   allegations unsupported by factual data." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir.

25   1989). "Summary judgment must be entered 'against a party who fails to make a showing

26   sufficient to establish the existence of an element essential to that party's case, and on

27   which that party will bear the burden of proof at trial.'" *United States v. Carter*, 906 F.2d

28   1375, 1376 (9th Cir. 1990) (quoting *Celotex*, 477 U.S. at 322).

III.    ANALYSIS

A.    **Plaintiff's Title VII Claim of Discrimination Based on Sex**

Defendant first moves for summary judgment as to Plaintiff's Title VII claim. (Def.'s MSJ at 6.)

1.    **Title VII Legal Standard**

Plaintiff claims she was discriminated against and constructively discharged because of her sex, in violation of Title VII. (Am. Compl. at 8–9.) Under Title VII, an employer may not "discriminate against an individual with respect to [her] . . . terms, conditions, or privileges of employment" because of her sex. 42 U.S.C. § 2000e–2(a). "This provision makes 'disparate treatment' based on sex a violation of federal law." *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1061–62 (9th Cir. 2002). "As a general matter, the plaintiff in an employment discrimination action need produce very little evidence in order to overcome an employer's motion for summary judgment." *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1124 (9th Cir. 2000).

In order to show disparate treatment under Title VII, Plaintiff must first establish a *prima facie* case of discrimination as the United States Supreme Court set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Villiarimo*, 281 F.3d at 1062. "Specifically, she must show that (1) she belongs to a protected class; (2) she was qualified for the position; (3) she was subjected to an adverse employment action; and (4) similarly situated men were treated more favorably, or her position was filled by a man." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). The degree of proof necessary to establish a *prima facie* case for a Title VII claim on summary judgment "is minimal and does not even need to rise to the level of a preponderance of the evidence." *Id.* (internal citations and quotations omitted).

"If the plaintiff establishes a *prima facie* case, the burden of production—but not persuasion—then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the challenged action. . . . If the employer does so, the plaintiff must show that the articulated reason is pretextual 'either directly by persuading the court that a

1    discriminatory reason more likely motivated the employer or indirectly by showing that

2    the employer's proffered explanation is unworthy of credence.'" *Id*. (internal citations

3    and quotations omitted). A plaintiff may rely on circumstantial evidence to demonstrate

4    pretext, but such evidence must be both specific and substantial. *Id*. At the last step, if the

5    plaintiff can show pretext, the only remaining issue is whether discrimination occurred or

6    not. *Id*.

7              **2.**        **Plaintiff Has Established a *Prima Facie* Case**

8            Defendant concedes that Plaintiff has met the first two prongs to establish a *prima*

9    *facie* case, but contends that she fails to meet the latter two. (Def.'s MSJ at 6–7.)

10   Defendant argues that not every employment decision amounts to an adverse

11   employment action and its "simple transfer" of Plaintiff does not constitute an adverse

12   employment action. (Def.'s MSJ at 7 (citing *Strother v. S. Cal. Permanente Med. Grp.*,

13   79 F.3d 859, 869 (9th Cir. 1996); *Steiner v. Showboat Operating Co.*, 25 F.3d 1459, 1465

14   n.6 (9th Cir. 1994)).)

15           The Ninth Circuit Court of Appeals takes an expansive view of the types of

16   actions that can be considered adverse employment actions. *Ray v. Henderson*, 217 F.3d

17   1234, 1241 (9th Cir. 2000). Adverse employment actions include demotions,

18   disadvantageous transfers or assignments, pay reductions, and imposition of a more

19   burdensome work schedule. *See id*. at 1241–44. Plaintiff has provided evidence that

20   meets the minimal degree of proof necessary to show Defendant's actions were more

21   than a "simple transfer" and that she suffered an adverse employment action. Plaintiff's

22   supervisor, Mr. Larson, and his supervisor, Mr. Montgomery, both testified that they

23   viewed a move from AE to FSR as a demotion. In addition, Ms. Grijalva, Plaintiff's

24   customer contact at Boot Barn, viewed the reassignment as a demotion. While the general

25   job responsibilities of FSRs and AEs overlap, Plaintiff provided evidence showing that

26   AEs were given more responsibility, including making important strategic decisions, and

27   managed larger sales amounts.

28

As to compensation, while Plaintiff was offered her same target compensation, she could only obtain that compensation if she met a certain sales goal that was based on her previous year's sales with the Boot Barn account. Plaintiff provided evidence of FSR compensation and sales in the Arizona territory showing FSRs made significantly less than Plaintiff did as an AE and suggesting that it would be very difficult for her to obtain the same level of sales, and thus target compensation, given the smaller Arizona territory sales.

The evidence Plaintiff proffered showing the differences between the Boot Barn AE position and the FSR Arizona territory position meets the minimal degree of proof necessary to raise a genuine issue of material fact as to whether Plaintiff's reassignment was an adverse employment action. Plaintiff has thus met the third prong required to establish a *prima facie* case for a Title VII claim.

Defendant also contends Plaintiff fails to show it treated similarly situated men more favorably. (Def.'s MSJ at 13.) Defendant fails to mention the second way in which Plaintiff may meet the fourth prong of the *prima facie* case, however. Under *McDonnell Douglas* and Ninth Circuit case law, a plaintiff must show that "similarly situated men were treated more favorably, *or* her position was filled by a man." *Villiarimo*, 281 F.3d at 1062 (citing *McDonnell Douglas*, 411 U.S. at 802). Plaintiff's position as AE on the Boot Barn account was filled by a man, Mr. Naylor. Defendant also later hired another man, Mr. Tomeu, as an AE on the Boot Barn account. While Defendant argues that Mr. Naylor was brought on as an AE only to do analytical work, he was still named AE on the Boot Barn account, and Plaintiff has offered sufficient facts to show that her position was filled by a man.

Thus, Plaintiff has met all four prongs necessary to establish a *prima facie* case for Title VII.

### 3. Defendant Has Articulated Some Legitimate, Nondiscriminatory Reason

Because Plaintiff has established a *prima facie* case, the burden of production moves to Defendant to articulate some legitimate, nondiscriminatory reason for the

challenged action. *Id*. Defendant argues that as Boot Barn experienced significant growth with the acquisition of approximately 100 stores, Boot Barn's need for more robust sales analysis also grew, and Boot Barn repeatedly informed Defendant that it needed better analysis from Defendant. Specifically, Mr. Larson testified that Ms. Grijalva often told him that Boot Barn needed better sales analysis from Defendant. Ms. Grijalva also stated she had told Mr. Montgomery that the Boot Barn account needed a person with more analytical skills to conduct sales data analysis. Defendant's supervisors and Plaintiff herself stated that Mr. Naylor had strong sales analysis skills that were superior to those of Plaintiff. In light of Plaintiff's weakness in the area of sales analytics and Ms. Grijalva informing Defendant's management of Boot Barn's increased need for sales analysis, Defendant has articulated a legitimate, nondiscriminatory reason for reassigning Plaintiff and making Mr. Naylor AE on the Boot Barn account.

### 4.    Plaintiff Has Presented Direct Evidence of Defendant's Discriminatory Motive

The burden now shifts back to Plaintiff to show Defendant's articulated reason is pretextual "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Chuang*, 225 F.3d at 1123. "Direct evidence is evidence, which, if believed, proves the fact [of discriminatory animus] without inference or presumption." *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1038 (9th Cir. 2005) (internal citation and quotations omitted). Generally, direct evidence "consists of clearly sexist, racist, or similarly discriminatory statements or actions by the employer." *Id*. (internal citation and quotations omitted). "When the plaintiff offers direct evidence of discriminatory motive, a triable issue as to the actual motivation of the employer is created even if the evidence is not substantial." *Godwin v. Hunt Wesson, Inc.*, 150 F.3d 1217, 1221 (9th Cir. 1998) (citing *Lindahl v. Air France*, 930 F.2d 1434, 1438 (9th Cir. 1991) (finding direct evidence of sexual stereotyping where employer believed that female candidates get "nervous" and "easily upset")).

Here, the record reveals direct evidence of Defendant's discriminatory animus. Plaintiff provided evidence from Ms. Grijalva's deposition in which she states that after asking Mr. Montgomery why he could not keep Plaintiff on the account instead of Mr. Barker, Mr. Montgomery responded "that he felt a male would be better to service workwear [with Boot Barn] at that time." (PSOF, Ex. 11, Grijalva Dep. at 126.) When asked the follow up question of whether Mr. Montgomery said that a male would be better for the workwear or that Travis Barker had a wealth of experience, Ms. Grijalva reiterated "[h]e said a male." (PSOF, Ex. 11, Grijalva Dep. at 126.) Mr. Montgomery's statements directly suggest the existence of bias for a male rather than a female to serve in Plaintiff's position as AE on the Boot Barn account, and no inference is necessary to find discriminatory bias. *See Goodwin*, 150 F.3d at 1221. While his remarks were not directed at Plaintiff, they were directed at Ms. Grijalva in direct response to her questioning Defendant's employment decision to take Plaintiff off of the Boot Barn account. His remarks were also not stray remarks unrelated to the decisional process. Mr. Montgomery was one of two decision makers responsible for Defendant's employee reconfiguration. Where a decision maker makes a remark against the class of which the plaintiff is a member, a reasonable factfinder may conclude that discriminatory animus played a role in the contested decision. *See Dominguez-Curry*, 424 F.3d at 1038. Although Mr. Montgomery may have had additional reasons for not wanting Plaintiff in her previous role, at this stage, Plaintiff has provided sufficient evidence that a discriminatory reason more likely motivated Defendant's employment decision. *See Villiarimo*, 281 F.3d at 1062.

To the extent Mr. Montgomery's statements to Ms. Grijalva constitute hearsay, when considering evidence proffered to avoid summary judgment, the Court focuses on content over form. *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form. We instead focus on the admissibility of its contents."); *see also Walters v. Odyssey Healthcare Mgmt. Long Term Disability Plan*, No. CV-11-00150-PHX-JAT, 2014 WL

4371284, at *3 (D. Ariz. Sep. 4, 2014). The contents of Mr. Montgomery's statements raise at least a genuine dispute as to whether Defendant was motivated by discriminatory reasons in its employment decision, and because Plaintiff may present the statements in admissible form at trial, the Court considers the statement for the purpose of resolving the Motion.

Plaintiff's direct evidence of discriminatory motive is sufficient to raise a genuine issue of fact as to whether Defendant's nondiscriminatory explanations were the true reasons or whether they concealed discriminatory motives. *See Godwin*, 150 F.3d at 1222. Accordingly, the Court will deny Defendant's Motion for Summary Judgment as to Plaintiff's Title VII claim on the basis of sex.

## B.    Plaintiff's ADEA Claim

Defendant next moves for summary judgment as to Plaintiff's ADEA claim. (Def.'s MSJ at 6.) Under the ADEA, it unlawful "to discharge any individual . . . because of such individual's age." 29 U.S.C. § 623(a)(1). Courts analyze ADEA claims differently depending on whether the claim relies on direct or circumstantial evidence. In this instance, Plaintiff identifies one direct comment about her age. Plaintiff testified that Mr. Larson commented that it was great to the see the "young energy," referring to Mr. Naylor and other employees, and "not gray hairs like you and I." This comment is like those in other cases involving the comments "old timers" and "[w]e don't necessarily like grey hair," that the Ninth Circuit found to be stray comments not directly tied to the employment decision complained of by the plaintiff. *See Nidds v. Schindler Elevator Corp.*, 113 F.3d 912, 918 (9th Cir. 1996); *Merrick v. Farmers Ins. Grp.*, 892 F.2d 1434, 1438 (9th Cir. 1990). The Court finds that Mr. Larson's single remark was not directly tied to Plaintiff's change in position and was only a stray remark not sufficient by itself to create an inference of discrimination.

The remainder of Plaintiff's evidence is circumstantial, and the Court must decide whether Plaintiff has an ADEA claim based on circumstantial evidence of discrimination by using the three-stage burden-shifting framework laid out in *McDonnell Douglas* and

1  applied above. *Diaz v. Eagle Produce Ltd. P'ship*, 521 F.3d 1201, 1207 (9th Cir. 2008).

2  Plaintiff must first establish a *prima facie* case of discrimination by demonstrating she

3  was "(1) at least forty years old, (2) performing [her] job satisfactorily, (3) discharged,

4  and (4) either replaced by substantially younger employees with equal or inferior

5  qualifications or discharged under circumstances otherwise 'giving rise to an inference of

6  age discrimination.'" *Id*. Defendant does not dispute the first two elements.

7  Defendant argues that the evidence shows that Plaintiff was not constructively

8  discharged as she claims, but rather voluntarily resigned. (Def.'s MSJ at 9.)

9  "[C]onstructive discharge occurs when the working conditions deteriorate, as a result of

10  discrimination, to the point that they become sufficiently extraordinary and egregious to

11  overcome the normal motivation of a competent, diligent, and reasonable employee to

12  remain on the job to earn a livelihood and to serve his or her employer." *Poland v.*

13  *Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007) (quoting *Brooks v. City of San Mateo,* 229

14  F.3d 917, 930 (9th Cir. 2000)). The constructive discharge inquiry is objective. *See id*. at

15  1184–85. It cannot be based upon a plaintiff's preference for one position over another

16  and does not turn on whether the plaintiff subjectively viewed his or her work conditions

17  as "a career ender" or "egregious." *See id*. at 1184–85 (no constructive discharge when

18  plaintiff demoted to non-supervisory position and reassigned to another state away from

19  family). In addition, "[d]issatisfaction with work assignments, a feeling of being unfairly

20  criticized, or difficult or unpleasant working conditions are not so intolerable as to

21  compel a reasonable person to resign." *Cecala v. Newman*, 532 F. Supp. 2d 1118, 1168

22  (D. Ariz. 2007).

23  The Ninth Circuit has "set the bar high for a claim of constructive discharge

24  because federal antidiscrimination policies are better served when the employee and

25  employer attack discrimination within their existing employment relationship, rather than

26  when the employee walks away and then later litigates whether his employment situation

27  was intolerable." *Poland*, 494 F.3d at 1184. A single, isolated instance of employment

28  discrimination is insufficient as a matter of law to support a finding of constructive

discharge, and a plaintiff must show some aggravating factors such as a continuous pattern of discriminatory treatment. *Watson v. Nationwide Ins. Co.*, 823 F.2d 360, 361 (9th Cir. 1987). Although the determination of constructive discharge is normally a factual question for jury, there may be cases in which the evidence is insufficient, as a matter of law, to establish a constructive discharge. *See Poland* at 1184.

The facts pertinent to Plaintiff's claim of constructive discharge are not in dispute, and based on that evidence, no reasonable juror could find that her working conditions rise to a level of objective intolerability. Plaintiff found the change in her position from an AE to a FSR to be a demotion that was insulting to her experience. She also stated it would result in a significant decrease in her pay due to less profitable sales territory and accounts. With regard to her working conditions, she stated that at times prior to the change in her position, Mr. Larson spoke to her in an aggressive tone regarding trivial items such as minor expenses she incurred and he was dismissive of some of her comments in meetings. After learning of the change in her position, however, Plaintiff requested that she still stay with Defendant as an employee and be moved to an AE position with a different account.

Plaintiff's evidence of her working conditions merely show her dissatisfaction with the change in her position, generally unpleasant working conditions, and a feeling of being unfairly criticized by Mr. Larson. *See Cecala*, 532 F. Supp. 2d at 1168. To the extent Plaintiff's change in position and related, alleged pay decrease constitutes a change in "working conditions," "a demotion, even when accompanied by a reduction in pay, does not by itself trigger a constructive discharge." *King v. AC & R Advert.*, 65 F.3d 764, 767–68 (9th Cir. 1995) (applying California constructive discharge law that mirrors federal law requiring plaintiff show work conditions were objectively extraordinary and egregious) (internal quotation omitted). Plaintiff's evidence of her change in position and Mr. Larson's criticism is not sufficient for a reasonable jury to find her working conditions were "sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent, and reasonable employee to remain on the job to earn

a livelihood." *See Brooks*, 229 F.3d at 930; *Cecala*, 532 F. Supp. 2d at 1168. Moreover, that Plaintiff wanted to stay with Defendant but be moved to an AE on a different account undermines her assertion that her working conditions with Mr. Larson were objectively unreasonable. Because Plaintiff fails to demonstrate she was discharged, she cannot make a *prima facie* ADEA claim. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's ADEA claim and dismisses Plaintiff's constructive discharge claim.[2]

### C.    Plaintiff's EPA Claim

Defendant also moves for summary judgment with regard to Plaintiff's EPA claim. (Def.'s MSJ at 17.) The plaintiff bears the burden of establishing a *prima facie* case of discrimination in an EPA case by showing that employees of the opposite sex were paid different wages for equal work. *Stanley v. Univ. of S. Cal.*, 178 F.3d 1069, 1073–74 (9th Cir. 1999). The *prima facie* case only involves a comparison of the jobs in question, not of the individuals who hold the jobs. *Id.* at 1074. The plaintiff must show that the jobs being compared are "substantially equal," not identical. *Id.*; *see* 29 C.F.R. § 1620.13(a). If the plaintiff meets her burden, the burden shifts to the defendant who must prove the difference in pay is attributable to a factor other than sex. *Garner v. Motorola, Inc.*, 95 F. Supp. 2d 1069, 1074 (D. Ariz. 2000), *aff'd*, 33 F. App'x 880 (9th Cir. 2002).

Plaintiff argues that her job as an AE and other male employees' jobs as AEs were substantially equal and that Plaintiff was paid less than her male counterparts. For example, she provides evidence that Mr. Merritt, an AE on the Boot Barn account like Plaintiff, made more money than her: as of 2013, Plaintiff's base salary was $74,831 and her target compensation for the year was $113,300, as compared to Mr. Merritt's base salary of $87,881 and target compensation of $160,000.

---

[2]  The Court reviewed Plaintiff's Supplemental Memorandum (Doc. 105), addressing the Court's recent decision regarding constructive discharge in *Cogan v. Maricopa Cnty.*, CV-14-01704-PHX-JJT, 2016 WL 627754 (D. Ariz. Feb. 17, 2016). However, the Court did not find Plaintiff's argument therein persuasive.

"Jobs are considered equal if their performance requires equal skill, effort, and responsibility and they are performed under similar working conditions." *Garner*, 95 F. Supp. 2d at 1075 (internal citations omitted). First, the Court notes the obvious fact that Plaintiff had the same title as those in the positions she is comparing her job to—an AE— and that also, she in part compares her job to an AE on the same account on which she worked. Second, Defendant does not dispute that a "significant portion of the AE role [for any account] is common to everyone in the position." Plaintiff also proffered evidence that her job as an AE was similar to that of other AEs. For example, Mr. Merritt testified that he and Plaintiff were equal partners and that, with regard to sales, they did substantially the same work on the account. While aspects may be different among the AE positions, and while Mr. Merritt may have had the title "lead" AE, that is not enough to distinguish the positions. Plaintiff has established some evidence of substantial equality between her job and those for which male employees were paid more, and the next question is whether she has overcome Defendant's affirmative defenses that the differential was based on a factor other than sex.

Under the EPA, the defendant can rely on four affirmative defenses in order to escape liability. 29 U.S.C. § 206(d)(1). These defenses permit instances of disparate pay "pursuant to (i) a seniority system; (ii) a merit system; (iii) a system which measures earnings by quantity or quality of production; or (iv) a differential based on any other factor other than sex." 29 U.S.C. § 206(d)(1). The last, broad exception covers legitimate business reasons for discriminating as to pay. For example, an employer can pay different salaries on the basis of "professional experience and education." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1322 (9th Cir. 1994). Liability under the EPA is akin to strict liability, and a plaintiff need not show a defendant's intent to discriminate. *See Maxwell v. City of Tucson,* 803 F.2d 444, 446 (9th Cir. 1986).

Defendant has advanced evidence that it uses factors other than sex to determine an employee's salary. It contends differences in compensation are based on sales experience, level of responsibility and sales volume, and job performance. (Def.'s MSJ at

19–21.) Using these factors, Defendant argues that all of Plaintiff's male coworkers have various characteristics, other than their sex, that legitimately entitle them to additional pay. The characteristics vary by individual, but it seems some males have more sales experience than Defendant (29, 33, and 12 years), some manage accounts with larger sales volume (approximately $26 million jointly managed, $13 million individually managed, $8 million individually managed), and some have received "exceptional" job performance ratings. In contrast, Defendant argues, Plaintiff only had six years of sales experience, jointly managed an account with $18.3 million in sales, and received only "strong" performance ratings.

Defendant has provided credible evidence that there were factors other than gender that influenced the pay differential among Plaintiff and male employees with substantially similar jobs. Although, at trial, Defendant's evidence may satisfy its burden under the affirmative defenses of the EPA, Plaintiff has rebutted Defendant's evidence with evidence showing sex may still be the basis for the difference. For example, Plaintiff provides evidence that contrary to Defendant's assertion that she had only had six years of sales experience, Plaintiff worked in some form of sales with Defendant since she joined the company in 1985, and thus her sales experience is not so different than her male counterparts. She also points to the higher compensation of Mr. Tomeu, who was made an AE on the Boot Barn account after Plaintiff left, despite that he did not have previous sales experience as an AE. Plaintiff contends Defendant's alleged distinction based on sales account revenue and other AEs' solo, rather than shared, management of accounts may not be fully credible because Plaintiff solely managed the Boot Barn account for at least a year when its sales were approximately the same as that of accounts solely managed by two of the other male AEs receiving higher compensation.

The record here has sufficient room for uncertainty and interpretation such that it cannot be said on a motion for summary judgment that Defendant has conclusively carried its burden of justifying the wage disparity. Plaintiff has demonstrated a material dispute of fact underlying Defendant's affirmative defense, and it would be inappropriate

1   to keep that factual determination from the jury. The Court therefore denies Defendant's

2   Motion for Summary Judgment as to Plaintiff's EPA claim.

3       **D.    Plaintiff's Retaliation Claim**

4       Finally, Defendant moves for summary judgment as to Plaintiff's retaliation claim.

5   (Def.'s MSJ at 21.) Plaintiff alleges after she complained of unequal wage and pay issues

6   to Defendant supervisors, Defendant demoted her and constructively discharged her in

7   retaliation for her complaints in violation of the FLSA. (Am. Compl. at 7–8.) Defendant

8   contends that because Plaintiff did not provide evidence that she complained about

9   unequal pay on the basis of sex, she did not engage in protected activity and cannot state

10   a claim for retaliation.

11       To assert a *prima facie* case of retaliation, a plaintiff must show "that: 1) [s]he

12   engaged in a protected activity; 2) [s]he suffered an adverse employment decision; and 3)

13   there was a causal link between the protected activity and the adverse employment

14   decision." *Villiarimo*, 281 F.3d at 1064. A plaintiff is considered to have engaged in

15   protected activity when, for example, she has filed an internal or formal complaint to

16   management about perceived discriminatory treatment. *See id*.

17       Plaintiff contends that prior to the change in her position she complained to

18   Mr. Larson, her supervisor, about her unequal pay on the basis of sex. The record shows,

19   however, that Plaintiff asked Mr. Larson whether she was being "paid equally amongst

20   [her] peers." From Plaintiff's question to Mr. Larson in this single incident, it is neither

21   clear that Plaintiff was complaining, nor that the inquiry concerned unequal pay *on the*

22   *basis* of her sex—which may constitute perceived discriminatory treatment—but only

23   that she was inquiring about her pay generally. Such a general inquiry with no link to

24   some perceived discriminatory treatment does not constitute protected activity. *See*

25   *Thomas v. City of Beaverton*, 379 F.3d 802, 811–12 (9th Cir. 2004). Plaintiff also states

26   that in 2007 and 2008, she told Mr. Merritt she was not being paid the same level as her

27   male counterparts. There is no evidence that Mr. Merritt had a role in the employment

28   changes affecting Plaintiff and that comments to him would have resulted in the adverse

employment decision against Plaintiff. *See Villiarimo*, 281 F.3d at 1064. Plaintiff provides no other evidence supporting her retaliation claim and makes no mention of the FLSA in her Response. The Court concludes no reasonable jury could find that Plaintiff complained about her unequal pay on the basis of sex and that she thereby engaged in a protected activity. Accordingly, the Court grants Defendant's Motion for Summary Judgment as to Plaintiff's Retaliation claim.

### E.    Plaintiff's AWA Claim

In Plaintiff's Partial Motion for Summary Judgment, she seeks a judgment requiring Defendant's payment of her alleged earned commissions, in addition to treble damages and attorneys' fees and costs. (Pl.'s MSJ at 1.) Defendant cross-moves for summary judgment. (Def.'s MSJ at 22.) In this claim, Plaintiff alleges that Defendant's refusal to pay her commissions on orders she completed before Defendant removed her from her AE position was in violation of the AWA. (Am. Compl. at 10–11; Pl.'s MSJ at 1.)

Under the AWA provision entitled "Payment of wages of discharged employee; violation; classification," when an employee quits or is discharged, "he shall be paid in the usual manner all wages due to him." A.R.S. § 23-353 (A), (B). The provision defining wages states:

> "Wages" means nondiscretionary compensation due an employee in return for labor or services rendered by an employee for which the employee has a reasonable expectation to be paid whether determined by a time, task, piece, commission or other method of calculation. Wages include sick pay, vacation pay, severance pay, commissions, bonuses and other amounts promised when the employer has a policy or a practice of making such payments.

A.R.S. § 23-350(6). Interpreting this provision, the Arizona Supreme Court held that the qualifying phrase "when the employer has a policy or practice of making such payments," only applies to the last, nonenumerated types of benefits—"other amounts promised." Here, the inquiry is whether Plaintiff had a reasonable expectation that she

would receive commissions for goods she took orders on while AE on the Boot Barn account, but which did not ship until after she was moved from that position and resigned from her employment with Defendant.

Mr. Larson averred that Defendant's policy is to pay commissions based on shipped goods for the time an account or territory is assigned to a sales representative. Mr. Larson also stated Defendant does not have a policy or practice of paying commissions to a resigning employee but that it does pay retiring employees commissions for seasonal merchandise booked prior to the date of retirement after the merchandise ships. Plaintiff stated that it was Defendant's policy to pay commissions once orders placed by Boot Barn had been shipped. Plaintiff contends that because she fulfilled all her responsibilities in securing such orders, she had a reasonable expectation to receive commission on those sales despite that she had resigned when Defendant shipped the orders. Plaintiff provides evidence to support her contention by showing that there was no written policy contrary to her expectations nor were other employees aware that sales representatives would not receive commissions upon resignation. District Sales Manager, Robert Bader, testified that company policy was to give departing AEs their commissions on goods booked before they left the company but shipped thereafter, and that he was unaware of any distinction between employees who retired and resigned. Plaintiff has proffered sufficient evidence to raise a genuine dispute of material fact as to whether she had a reasonable expectation of payment of commissions after her resignation. Accordingly, the Court denies Defendant's Motion for Summary Judgment as to Plaintiff's AWA claim and denies Plaintiff's Partial Motion for Summary Judgment for Unpaid Commissions Due to Her. Because the Court does not decide whether Plaintiff is entitled to commissions, it cannot decide whether Plaintiff is entitled to treble damages.

## IV.    CONCLUSION

The Court finds a genuine dispute exists as to whether Defendant discriminated against Plaintiff on the basis of her sex in violation of Title VII, paid her different wages

for equal work as compared to males in violation of the EPA, and denied her wages for equal work as compared to the opposite sex in violation of the EPA, and was denied wages for which she had a reasonable expectation in violation of the AWA. Accordingly, the Court denies Defendant's Motion for Summary Judgment with respect to these three claims and Plaintiff's Partial Motion for Summary Judgment for Unpaid Commissions Due to Her.

The Court also finds Plaintiff has not proffered sufficient evidence from which a juror could conclude that Plaintiff was constructively discharged because of her age or retaliated against due to engagement in protected activity. The Court thus grants Defendant's Motion for Summary Judgment as to Plaintiff's ADEA, constructive discharge, and retaliation claims.

**IT IS THEREFORE ORDERED** granting Defendant VF Jeanswear LP's Motion for Summary Judgment as to Plaintiff's ADEA, constructive discharge, and retaliation claims and denying the Motion as to Plaintiff's Title VII, EPA, and AWA claims (Doc. 79). This matter will proceed to trial on Plaintiff's remaining claims against Defendant, and the Court will set a Pretrial Conference by separate Order.

**IT IS FURTHER ORDERED** denying Plaintiff's Motion for Summary Judgment for Unpaid Commissions Due to Her (Doc. 81.)

Dated this 30th day of June, 2016.

_____
Honorable John J. Tuchi
United States District Judge