**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF ARIZONA**

| | |
|---|---|
| Lori Bell,<br><br>               Plaintiff,<br><br>v.<br><br>VF Jeanswear LP, *et al.*,<br><br>               Defendants. | No. CV-14-01916-PHX-JJT<br><br>**ORDER** |

At issue is the Court's determination of Plaintiff's compensatory, punitive and equitable damages in this matter. Also at issue is Defendant's related Renewed Motion to Limit Plaintiff's Equitable Remedies (Doc. 208), to which Plaintiff filed a Response (Doc. 211). After a jury verdict in Plaintiff's favor on her Title VII claim of discrimination based on sex (Doc. 204), the Court held a three-day evidentiary hearing with regard to Plaintiff's equitable damages (Docs. 217, 218, 223). In addition, the parties each filed numerous briefs (Docs. 124, 127, 128, 129, 133, 148, 149, 208, 209, 211, 234, 236, 238, 239) on the issue of whether the amount of Plaintiff's equitable damages is limited by the fact that Plaintiff resigned from her employment after Defendant placed her in a new position, which the jury concluded was an adverse employment action motivated by Plaintiff's sex (Doc. 204).

## I. COMPENSATORY AND PUNITIVE DAMAGES

For a corporation the size of Defendant, Title VII imposes a cap on the sum of compensatory and punitive damages of $300,000 per plaintiff. 42 U.S.C. § 1981a(b)(3). Here, the jury awarded Plaintiff $28,000 in compensatory damages and $500,000 in

punitive damages. (Doc. 204, Verdict.) Under the statute, the Court must reduce this single-Plaintiff award to $300,000.

## II.    EQUITABLE DAMAGES

### A.    Legal Standards

The principal dispute remaining between the parties in this action regards the availability of the Title VII equitable damages of back and front pay. Defendant contends that Plaintiff is not entitled to any equitable relief after her resignation on February 28, 2014, because the Court ruled that Plaintiff's resignation was not a constructive discharge. Under such circumstances, Defendant argues, Plaintiff's resignation is a failure to mitigate and thus bars recovery of equitable damages after the resignation date as a matter of law. (*E.g.*, Doc. 236 at 4-5.)[1]

Plaintiff interprets the law and facts in another way. She points out that the fundamental purpose of equitable relief under Title VII is to make a plaintiff whole by restoring her to a position where she would have been absent the unlawful discrimination. (*E.g.*, Doc. 234 at 3 (citing *Franks v. Bowman Transp. Co.*, 424 U.S. 747, 763-64 (1976)).) She argues that the case law does not support Defendant's position that a plaintiff's resignation is a total bar to recovery of equitable damages after the resignation date; instead, Plaintiff contends, in an instance in which a plaintiff resigns after a discriminatory adverse employment action and under a threat of discharge, a court must determine whether the resignation was causally related to the employer's unlawful conduct. (*E.g.*, Doc. 209 at 3-4 (citing *Caudle v. Bristow Optical Co.*, 224 F.3d 1014, 1020 (9th Cir. 2000) and *Sangster v. United Air Lines, Inc.*, 438 F. Supp. 1221, 1228-30 (N.D. Cal. 1977), *aff'd*, 633 F.2d 864 (9th Cir. 1980)).) Because the jury found that

---

[1] Citing *Thorne v. City of El Segundo*, 802 F.2d 1131, 1134-35 (9th Cir. 1986), Defendant argues that only a narrow exception to the bar exists in instances in which a plaintiff declines to accept or retain a position from the employer that is materially different from the position the plaintiff sought. According to Defendant, Plaintiff has failed to demonstrate that the old position she occupied—account executive—and the new position she declined to retain—field sales representative—involved different duties and were thus materially different. (*E.g.*, Doc. 236 at 5-6.) Discussion of the exception the court in *Thorne* addressed is fruitless here. *Thorne* addressed a refusal to hire claim which, as discussed elsewhere, necessitates a different analysis than a demotion claim.

Defendant's offer of a field service representative ("FSR") position instead of Plaintiff's prior position of account executive ("AE") was an adverse employment action motivated by Plaintiff's sex, Plaintiff argues that her resignation was not "voluntary" in the sense that it was caused by Defendant's unlawful conduct; indeed, under Title VII, a plaintiff is not required to "accept a demotion, or take a demeaning position," to mitigate her damages. (*E.g.*, Doc. 234 at 2 (citing *Ford Motor Co. v. EEOC*, 458 U.S. 219, 231 (1982)).)

Plaintiff thus also disagrees with Defendant on the effect of the Court's prior ruling on summary judgment. In its Order, the Court concluded that Plaintiff's resignation was not a constructive discharge. (Doc. 108.) Defendant urges that ruling precludes Plaintiff's recovery of equitable relief after resignation, because constructive discharge under Title VII requires a showing that a defendant engaged in extraordinary or intolerable conduct that forced the plaintiff to resign. But Plaintiff disagrees, citing the holding of *Ford Motor Co.* above, and noting that the possibility of such recovery only requires that Plaintiff show her resignation was a consequence of Defendant's unlawful conduct. (*E.g.*, Doc. 209 at 4-5 (citing *Thorne*, 802 F.2d at 1136 and *Odima v. Westin Tucson Hotel*, 53 F.3d 1484, 1495 (9th Cir. 1995)).)

The Court will decline Plaintiff's invitation to revisit its conclusion as a matter of law that her resignation was not a constructive discharge. Constructive discharge is a high bar, met only by the deterioration of working conditions "to the point that they become sufficiently extraordinary and egregious to overcome the normal motivation of a competent, diligent and reasonable employee to remain on the job to earn a livelihood and to serve his or her employer." *Poland v. Chertoff*, 494 F.3d 1174, 1184 (9th Cir. 2007). While Plaintiff's demotion here constituted actionable and compensable discrimination, as found by the jury, the facts of that discrimination do not go as far as required in the Ninth Circuit for a finding of constructive discharge. *E.g., Cecala v. Newman*, 532 F. Supp. 2d 1118, 1168 (D. Ariz. 2007).

The Court concludes, however, that the lack of a finding of constructive discharge in the circumstances of this case is no bar *per se* to recovery of equitable damages beyond Plaintiff's resignation date. Defendant's argument to the contrary overreaches the extant case law of this circuit. Defendant cites *Thorne*, 802 F.2d at 1134-35, and *Odima*, 53 F.3d at 1495, for the proposition that Plaintiff's resignation is a "total bar" to recovery beyond the resignation date.[2] But both of these cases dealt with Title VII discrimination claims based on wrongful refusal to promote. *Thorne* and *Odima* thus present circumstances qualitatively different from the circumstance present here, where the jury found that Defendant wrongfully *demoted* Plaintiff. In the *Thorne/Odima* circumstance, while a plaintiff suffers unlawful discrimination resulting in a failure to advance, such a plaintiff still has what she had before the discriminatory act. Thus the policy goal contemplated by Title VII of having the "parties, where possible, attack discrimination within the context of their existing employment relationships," *Thorne*, 802 F.2d at 1134, is properly served by requiring the employee to remain in their job, because that requirement does not work an intolerable hardship on the employee, who still has the same job she had before the discriminatory act, under the same terms.

In the instant case, however, requiring Plaintiff to remain in her employment with Defendant would require her to accept a demotion—a qualitatively worse working situation; a loss. Such a result does not serve the purposes of Title VII as noted above in *Thorne*; moreover it is contrary to the holding of *Ford Motor Co.* that a Title VII claimant need not accept a demotion to maintain her right to collect back pay. 458 U.S. at 231. This distinction does make a difference.

Moreover, the case law regarding the legal standard the Court is to apply in its determination of equitable damages generally supports Plaintiff's framing of the

---

[2] In its early briefing on this issue, Defendant also cited *Sanchez v. City of Santa Ana*, 915 F.2d 424, 431 (9th Cir. 1990) in support of this proposition, but in subsequent briefing ceased referring to the case. This is appropriate, as *Sanchez* was an action under Section 1983 for violation of a due process right, not an employment discrimination claim under Title VII. Defendant also initially cited *Satterwhite v. Smith*, 744 F.2d 1380 (9th Cir. 1984) and then ceased to advance it in subsequent briefing. Like *Thorne* and *Odima*, *Satterwhite* is a failure to promote case, not an unlawful demotion case.

standard. The goal of the equitable damages award is to make a plaintiff whole for injuries suffered as a result of discrimination. *Caudle*, 224 F.3d at 1020; *Gotthardt*, 191 F.3d at 1154. "[T]here is a presumption in favor of back pay awards," and "front pay is made in lieu of reinstatement when the antagonism between employer and employee is so great that reinstatement is not appropriate." *Caudle*, 224 F.3d at 1020. And as a threshold matter, equitable damages resulting from a Title VII violation, including back and front pay, are to be determined by the Court, not a jury. *Lutz v. Glendale Union High School*, 403 F.3d 1061, 1069-70 (9th Cir. 2005); *Caudle*, 224 F.3d at 1020; *Gotthardt v. Nat'l R.R. Passenger Corp.*, 191 F.3d 1148, 1152 (9th Cir. 1999).

Contrary to Defendant's argument, the availability and limitations of any equitable award in the circumstances of this case is not determined by this Court's finding as to constructive discharge. Rather, the Court will determine any limitations on back pay or front pay based on whether Plaintiff met her duty to mitigate her damages. Title VII, 42 U.S.C. § 2000e-5(g)(1), "imposes upon plaintiffs seeking back pay a duty to mitigate damages by seeking alternative employment with reasonable diligence," and the same duty applies to awards of front pay. *Caudle*, 224 F.3d at 1020 (internal quotations omitted). Also contrary to Defendant's arguments, and as set forth above, the case law does not unequivocally state that a plaintiff's resignation from employment with the employer that has engaged in a discriminatory adverse employment action is a *per se* failure to mitigate damages with reasonable diligence. *Ford Motor Co.*, 458 U.S. at 231 (the plaintiff need not "accept a demotion" or "take a demeaning position"); *see also Carrero v. N.Y. City Housing Auth.*, 890 F.2d 569, 580 (2d Cir. 1989) (stating a Title VII claimant "is required to mitigate damages but is not required to accept a demotion" (internal quotations omitted)).

Instead, whether resignation is a failure to mitigate with reasonable diligence depends on the circumstances. If, as here, a jury has found that a plaintiff was unlawfully demoted by her employer, the Court must determine as part of its mitigation analysis whether the plaintiff's subsequent resignation was caused by the employer's

discriminatory adverse employment action, considering all the circumstances.[3] *See Carrero*, 890 F.2d at 580-81; *Thorne*, 802 F.2d at 1135-36 & n.4; *Sangster*, 438 F. Supp. at 1228-30. For the reasons set forth in detail above, the Court concludes Plaintiff's resignation was causally related to her unlawful demotion and did not constitute a failure to mitigate. *Ford Motor Co.*, 458 U.S. at 231.

Similarly, once a plaintiff is no longer employed, the Court must determine as part of its mitigation analysis whether her subsequent efforts toward securing new employment were reasonable.

### B.    Findings of Fact

The Court makes the following findings of fact relevant to its decision on equitable damages:

1.    Plaintiff was employed by Defendant as an AE from some time in 2007 through her resignation on February 28, 2014.

2.    As an AE, Plaintiff earned according to a Pay Plan that was established each year by Defendant's management for each AE. Plaintiff's Pay Plan, like that of every other AE, had two components: a base salary and an expected commission based on the previous year's sales on the AE's assigned account. The combination of these two elements yielded a number known as "target compensation" for that employee. If Plaintiff reached the expected commission based on the previous year's sales, she would make the "target compensation." If she exceeded the sales number contemplated by the expected commission, she would make more.

3.    In 2013, Plaintiff's target compensation as an AE on the Boot Barn account was $113,000. Due to sales performance of the AEs on the Boot Barn account, Plaintiff

---

[3] The Court acknowledges the similarities between determining whether Plaintiff's resignation was a constructive discharge and whether Plaintiff mitigated her damages with reasonable diligence, but for the reasons set forth above the Court does not find that its prior entry of summary judgment in favor of Defendant on Plaintiff's constructive discharge claim (Docs. 108, 111) precludes an award of equitable damages beyond Plaintiff's resignation date after a jury found Defendant discriminatorily demoted Plaintiff. *See Teutscher v. Woodson*, 835 F.3d 936, 944 (9th Cir. 2016) (stating that, in resolving equitable claims, "the trial judge must follow the jury's implicit or explicit factual determinations" (internal quotations omitted)).

exceeded her expected commissions in the 2013 Pay Plan and therefore her target compensation for 2013, by $14,278, for a total compensation of $127,278. (Ex. 360; Doc. 234 at 4.)

4.     Defendant's Vice President and General Manager of Wrangler Western Wear Specialty testified at various times that Defendant expected the target compensation for commissioned sales representatives to increase between three and five percent per year, although sales personnel did not always receive a merit raise. The Court finds that a reasonable factor to apply over time for any necessary projection of AE annual compensation increases is four percent.

5.     Defendant maintained a retirement savings plan for employees, in which Plaintiff participated. The plan had two components: 1) a 401(k) feature where employees' contributions to the account would receive a matching contribution of up to fifty percent from Defendant; and 2) a "retirement contribution feature" where qualifying employees would receive a quarterly contribution from Defendant.

6.     At the time of her resignation from employment with Defendant, Plaintiff was 100 percent vested in the 401(k) feature because she had been employed in excess of five years. In Plaintiff's final two years as an AE, Defendant contributed $3,818 per year into Plaintiff's 401(k) account.

7.     By the terms of the "retirement contribution feature," Plaintiff did not qualify for its additional quarterly contributions. The plan provided that "generally," only employees hired or rehired after January 1, 2005 were eligible for the quarterly payments. Plaintiff presented no evidence that she was an exception to this general provision excluding employees hired or rehired before January 1, 2005, and in fact testified at trial that she was unaware of the feature.

8.     Defendant also maintained an employee pension plan that featured defined monthly benefit payments for participating employees upon reaching designated retirement ages. Defendant advised Plaintiff by letter after her resignation that she was entitled to a "deferred vested benefit" under the plan. The letter advised that, based on her

time in employment with Defendant through February 28, 2014, upon reaching the normal retirement age of 65, Plaintiff would be eligible to receive an estimated monthly benefit payment of $1,801. The letter also advised Plaintiff she could elect to begin participation in the pension plan at the early retirement age of 55, and receive an unspecified lesser monthly amount. (Ex. 63.)

9.     Plaintiff presented no evidence of life insurance premiums, health insurance premiums, or specific costs or medical care paid after her resignation. *Galindo v. Stoody Co.*, 793 F.2d 1502, 1516-17 (9th Cir. 1986). She testified that while employed by Defendant she participated in the health insurance coverage benefit Defendant provided to its employees. On direct examination, Plaintiff testified she did not believe there was a deductible on the insurance provided through Defendant's plan, but on cross-examination, she testified that she did not know or remember whether deductibles applied or what they were. She also testified that when she left her employment with Defendant, she went onto her husband's health insurance plan, which had a deductible of "about 1,500" dollars in 2014 and 2015 and "about 2,000" thereafter.[4] (Tr. 5/4/17 at 293-94.) Plaintiff testified she exhausted the deductibles in each of those years. (*Id.*)

---

[4] In Plaintiff's Proposed Findings of Fact and Conclusions of Law, her counsel submitted, and urged this Court to accept as fact, that

> [a]fter separation from VFJ, Bell went on the health insurance plan offered by her husband's company where she had, and exhausted, a $2,000 deductible in 2014 and 2015, and a $5,000 deductible in the following years.

(Doc. 235 ¶ 23.) There is no basis in the evidence for the numbers Plaintiff's counsel proffered as fact here. Counsel himself asked the question that elicited from Plaintiff that her deductibles were $1,500 per year for 2014 and 2015 and $2,000 per year thereafter. The proposed "facts" are just wrong, they represent a real and significant dollar discrepancy, and the inaccuracy matters. The Court notes that this is but one example of several instances in this matter where Plaintiff's relation of evidence or argument to the Court does not line up with the record or the law, and even if the Court is charitable in its conclusion that the misstatements are merely the product of sloppiness or inattention that always seems to inure to the benefit of Plaintiff, there is a huge cost. Plaintiff submitted thirteen pages of proposed findings of fact and conclusions of law on which the Court's judgment might turn. In stark contrast to Defendant's proposed findings, every one of which was sourced to the supporting evidence in an exhibit and or the transcript of trial, not one of Plaintiff's proposed findings cited to the record. The amount of time the Court has spent scouring the record attempting to verify Plaintiff's assertions—sometimes unsuccessfully—has wasted a precious resource and delayed the completion of this Order

10. On January 14, 2014, Defendant reassigned Plaintiff from her position as an AE on the Boot Barn account to an FSR for a geographic area, rather than a specific customer. That reassignment was a demotion.

11. When Defendant reassigned Plaintiff to the Arizona Territory FSR position, it formulated a 2014 Pay Plan, which would begin March 1, 2014, that had target compensation for Plaintiff of $113,000—the same level set as her 2013 AE Pay Plan.

12. After Plaintiff resigned her position with Defendant in February 28, 2014, she registered with job announcement websites where she would set filters for job and compensation characteristics that were in her judgment equivalent to what she had with Defendant. (Tr. 5/3/17 at 43.) One of those websites was salesforce.com. (Tr. 5/3/17 at 192; Ex. 439.) In setting job selection criteria for alerts from the salesforce.com website, Plaintiff specified job type as "sales" or "account executive" and requisite salary at between $130,000 and $150,000. (Tr. 5/3/17 at 191-94; Ex. 439.) Plaintiff testified that these two criteria delimited what was "suitable" employment for her, along with three other parameters: 1) any job that required relocation would not be suitable, although one that required travel would be suitable; 2) a job involving sales of items other than western wear apparel would not have been suitable; and 3) a job that was at either a higher or lower level than AE would not be suitable. (Tr. 5/3/17 at 185-87.)

13. From her resignation on February 28, 2014, until the time of her deposition on March 24, 2015, Plaintiff did not formally apply for any jobs. (Tr. 5/3/17 at 212-13.) She testified that sometime during 2014, a person connected to her former supervisor reached out to her about a sales job at Stetson, a western apparel and accessory company, and Plaintiff agreed to a telephonic interview. Plaintiff was not interested in the position because she concluded the compensation, benefits and other circumstances were unsuitable. (Tr. 5/3/17 at 195-96.) Her affirmative job search activity during that thirteen

---

substantially. Perhaps most significantly, it has led the Court to question the presumption that it can rely on the complete accuracy of the representations made by counsel in the proceedings before it.

month period was limited to viewing the internet, and initiating one email exchange with a recruiter in September 2014. (Ex. 314.)

14.     After Plaintiff's deposition, in the seven month period from April to October 2015, Plaintiff applied for 15 jobs, but received no offers. (Exs. 324-38, 454.)

15.     In the 19 months from October 2015 until completion of trial in this matter in May 2017, Plaintiff applied for only one position, as a marketing and public relations executive with the Hillsborough Hops minor league baseball organization in suburban Portland, Oregon. (Tr. 5/3/17 at 225-26.) The position did not meet Plaintiff's own criteria for suitability in that it would have required relocation to Oregon and had nothing to do with western wear apparel sales.

16.     Plaintiff has had no in-person job interviews since resigning her position with Defendant in February 2014. Despite by her own account being well known in the western wear apparel industry, Plaintiff sought no help in her job search from contacts at her former Boot Barn account, and beyond making a single call to a contact at industry member Corral, Plaintiff did not reach out to any other colleagues or competitors in the western wear apparel industry. (Tr. 5/3/17 at 196-99.)

17.     At trial in this matter, the jury found that Plaintiff proved by a preponderance of the evidence that Defendant took an adverse employment action or actions against her. (Doc. 204.)

18.     The jury found that Plaintiff proved by a preponderance of the evidence that Plaintiff's sex was a motivating factor in such adverse employment action or actions. (*Id.*)

19.     The jury found that Defendant proved by a preponderance of the evidence that its action or actions were motivated by a lawful reason. ( *Id.*)

20.     The jury found that Defendant did not prove by a preponderance of the evidence that it would have taken the same action or actions even if Plaintiff's sex had played no role in the employment decision. ( *Id.*)

21.     The jury therefore found Defendant liable to Plaintiff for sex discrimination under Title VII and awarded compensatory and punitive damages as set forth above.

22.     The jury found that Plaintiff proved by a preponderance of the evidence that Plaintiff was paid less than a male employee for substantially equal work on a job the performance of which requires substantially equal skill, effort, and responsibility, and which was performed under similar working conditions. (*Id.*)

23.     The jury found that Defendant proved by a preponderance of the evidence that the difference in pay resulted from one or more factors other than sex. (*Id.*)

24.     The jury therefore found that Defendant was not liable to Plaintiff for violating the Equal Pay Act.

25.     The jury found that Plaintiff did not prove by a preponderance of the evidence that she had a reasonable expectation to receive commissions on shipments to Boot Barn based on orders placed prior to February 28, 2014. (*Id.*) The jury therefore found Defendant was not liable to Plaintiff for violation of the Arizona Wage Act.

26.     It is neither feasible nor practical to reinstate Plaintiff to her former position with Defendant.

**C.     Determining the Scope of Equitable Damages**

The Court having concluded that Plaintiff's resignation does not bar an award of equitable damages beyond the date of her resignation, it must determine what those damages are and whether Plaintiff's post-resignation job-seeking efforts adequately mitigated them. Back pay damages "are determined by measuring the difference between actual earnings for the period and those which [the plaintiff] would have earned absent the discrimination by [the] defendant." *Gotthardt*, 191 F.3d at 1158 (internal quotations omitted). So long as a plaintiff continues to mitigate her damages from a discriminatory act with reasonable diligence, the back pay award runs "from the date of the discriminatory act until the date of final judgment." *Thorne*, 802 F.2d at 1136. The backpay period may terminate, however, if the Court finds that a plaintiff voluntarily removed herself from the job market. *Id.* at 1136-37; *see also Caudle*, 224 F.3d at 1020

(finding the plaintiff's withdrawal from the workforce was uncompelled by her situation and unaffected by the defendant's discriminatory behavior, such that it constituted a failure to mitigate damages with reasonable diligence). Ultimately, the Court must determine the amount of the equitable damages that will make Plaintiff whole, but not more than whole, considering Plaintiff's efforts to mitigate her damages with reasonable diligence. *Caudle*, 224 F.3d at 1020-21.

Defendant asserts that Plaintiff failed to mitigate her damages through her inadequate efforts, which failure bars recovery. To prevail on a defense of failure to mitigate damages, Defendant must show by a preponderance of evidence that 1) substantially equivalent jobs were available to Plaintiff and 2) she failed to use reasonable diligence in seeking such employment. *Cheeks v. General Dynamics*, 22 F. Supp. 3d 1015, 1026 (D. Ariz. 2014) (citing *Odima*, 53 F.3d at 1497).

### 1. Proof of Substantially Equivalent Employment

Plaintiff argues Defendant failed to meet its burden to prove employment was available to Plaintiff after her resignation that was substantially equivalent to the AE position she had before her reassignment. First, Plaintiff argues that the only evidence of substantial employment Defendant proffered came through the testimony of its expert, forensic economist Nathaniel Curtis, which should be excluded for failure to satisfy the requirements for expert testimony under Fed. R. Evid. 702 and *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579 (1993). According to Plaintiff, Curtis's testimony is not scientifically valid and his reasoning and methodology cannot be properly applied to the facts at issue here. (Doc. 234 at 13.) The Court rejects this argument.

*Daubert* provides that scientific validity is a necessary prerequisite when the expert's scientific, or perhaps technical, knowledge qualifies her as an expert. But Curtis is not being offered as an expert in either of those capacities, as in the case of a physician, toxicologist, environmental scientist or structural engineer. Defendant offers Curtis as an expert for the third category of expertise contemplated by Fed. R. Evid. 702—his other specialized knowledge, which is not subject to scientific validation or peer review.

Curtis's proffered expertise is more akin to the expertise offered by a law enforcement professional who might testify as to markets and market pricing for controlled substances based on experience developing access to such market information. As for the reasoning and methodology Curtis employed, the Court finds the information offered through his testimony meets the requirements. Defendant adduced from Curtis the sources of information upon which he based his opinion about the availability of substantial equivalent employment, the circumstances under which he acquired that information, and what that information was. This is sufficient for purposes of allowing the finder of fact— here, the Court—to understand, evaluate and assign the appropriate weight to Curtis's opinions. Those opinions and the bases for them are thus properly before the Court within Fed. R. Evid. 702 and *Daubert*.

Plaintiff next argues the Court should reject in blanket fashion Curtis's opinion that substantially equivalent jobs were available because Curtis relied on national employment and unemployment figures for wholesale and retail sales personnel generally, and not in the western wear industry specifically. (Doc. 234 at 13.) This position is consistent with Plaintiff's testimony at trial that she need not consider any jobs beyond western wear AE as substantially equivalent, and it is incorrect, in that the test Plaintiff would have the Court impose is far narrower than provided for in law.

"Substantially equivalent employment is that which affords virtually identical promotional opportunities, compensation, job responsibilities, working conditions and status as the position from which the Title VII claimant has been discriminatorily terminated." *Cheeks*, 22 F. Supp. 2d at 1027. If these requirements are met, a replacement job may differ in other respects from the plaintiff's prior employment. As long as a sales job offers a claimant very similar opportunities for promotion and compensation, features similar responsibilities, conditions and status as the prior job, it is suitable, even if the merchandise to be sold is different in type or character. Where the merchandise to be sold or marketed in the replacement job is so different in character or type that a fundamental lack of knowledge or familiarity with the product might affect a claimant's opportunities

for promotion or compensation—for example, requiring Plaintiff here to sell heavy equipment, industrial chemicals or software development services—the Court might well find a lack of suitability in the new employment.[5] But a job in sales of other apparel and accessory items, whether specialty or general, is not so different in character that Plaintiff's initial lack of intimate familiarity with the product line or industry could be said to affect her opportunities for promotion or compensation. The law does not allow Plaintiff to redefine what is substantially equivalent employment such that it eliminates all other possible employment.

Moreover, Curtis's testimony demonstrates an effort to exercise reasonableness in identifying suitable, or substantially equivalent, employment in his study. Curtis testified he used Plaintiff's AE job description—including her own compensation criteria—as a comparator, and Defendant presented credible evidence that using that criteria, Curtis was able to identify evidence of many substantially similar employment opportunities after a relatively brief search of approximately five hours. Curtis then consulted with Defendant's Vice President of Human Resources, who was familiar with the AE position at the company, and based on her feedback, he eliminated several potential positions from the list of substantially equivalent positions. The Court can, and does, find that Defendant has met its burden of proving that substantially equivalent positions did exist as of the time Curtis conducted his investigation.

Finally, Plaintiff argues that even if Curtis's evidence demonstrates substantially equivalent employment existed for her, Defendant failed to prove its existence prior to the end of August 2015. Here Plaintiff is correct. Defendant's evidence is silent as to the availability of suitable jobs prior to late August 2015. And beyond Curtis's testimony, Defendant offered no evidence on availability of suitable employment. The Court

---

[5] *See, e.g., Cassella v. Mineral Park, Inc.*, No. CV-08-1196-PHX-MHM, 2010 WL 454992 (D. Ariz. Feb. 9, 2010)("It is doubtful a flower delivery job, for example, would be substantially equivalent to one involving the operation of loaders, forklifts, and dump trucks merely because it involves driving.") That is a far cry from what we have here, where western wear sales can be compared to other style clothing and even accessory sales.

- 14 -

concludes as a matter of law that Defendant has failed to meet its burden to prove the first element of its failure to mitigate defense prior to the end of August 2015.

**2.      Proof of Plaintiff's Lack of Reasonable Diligence in Job Seeking**

The Court also concludes as a matter of law that Defendant met its burden of proving suitable employment was available to Plaintiff as of the end of August 2015. It therefore must evaluate whether Defendant has shown that as of that time, Plaintiff had failed to use reasonable diligence in seeking employment. Upon evaluation, the Court concludes that Defendant has met that burden.

At trial, and as the Court found above, Defendant showed that for more than a year after her resignation, or until April 2015, Plaintiff failed to submit a formal application for any job. Plaintiff testified that, despite being well known in the western apparel sales community, she did not seek to use her contacts to find employment opportunities in that discrete community, including reaching out to her former account contact at Boot Barn, whom the evidence indicated held Plaintiff in high professional and personal regard. Only after Plaintiff was deposed by Defendant's counsel in March 2015 and asked questions about her efforts at mitigation did she begin to apply for jobs. From April through October 2015, Plaintiff filled out 15 job applications online. More than half of the positions she applied for were wholly outside the industry Plaintiff has argued she must be employed in or would be acceptable to her, and involve skill sets and familiarity with other industries that Plaintiff has testified are outside her range, including positions as a wealth management advisor, multiple marketing positions for the Phoenix Suns organization, a position in telecommunications sales and one with Legacy Bowes Group, a management and leadership consulting and executive recruitment firm. From October 2015 through trial in May 2017, Plaintiff applied for only one additional position, in sales and marketing for the Portland, Oregon-based minor league baseball team Hillsboro Hops. Plaintiff's only other professional development efforts identified at trial included the formation of a business consulting firm whose only clients to date of trial were her family members and their respective businesses.

1   The Court concludes from the above that the limited job seeking activities Plaintiff
2   undertook considered in total, the circumstances under which she undertook them, the
3   timing of her limited actions and the character of the positions she applied for, do not
4   constitute reasonable efforts at mitigation of damages. They are *post hoc* attempts to
5   create the appearance of diligence. Defendant has met its burden of proving by a
6   preponderance of the evidence that, as of the end of August 2015, Plaintiff was not
7   reasonably mitigating her damages. Therefore as of that date, both elements were met on
8   Defendant's failure to mitigate defense, and the Court will award back pay only through
9   the end of August 2015—a period of exactly eighteen months after Plaintiff's resignation.
10  For that reason, the Court will deny Defendant's Renewed Motion to Limit Plaintiff's
11  Equitable Remedies (Doc. 208) to the extent that remedies are not barred after Plaintiff's
12  resignation on February 28, 2014, simply because the Court found such resignation was
13  not a constructive discharge. However, the Court will grant the Motion to the extent that
14  Plaintiff's failure to mitigate damages after August 31, 2015, bars equitable relief from
15  that point forward.

16          **D.      Calculation of Equitable Damages**

17          Having determined that Plaintiff is entitled to equitable relief in the form of back
18  pay for the eighteen month period from March 1, 2014 through August 31, 2015, the
19  Court must determine the rate at which that back pay shall be awarded. Plaintiff urges
20  that her back pay compensation rate for the period should be set at the level of select
21  former AE colleagues who had higher pay plans than her during the last pay plan year
22  before her resignation—2013—or the year thereafter—2014. But the jury rejected
23  Plaintiff's Equal Pay Act claim, finding that the difference in pay between Plaintiff and
24  others, including Lory Merritt, "resulted from one or more factors other than sex."
25  (Doc. 204.) And the Court ruled before and during trial that unequal pay was not
26  adequately alleged as a part of Plaintiff's Title VII sex discrimination claim. Plaintiff's
27  argument for a baseline compensation package higher than she ever earned while

28

employed by Defendant is therefore an overreach unsupported by the other verdicts in this case, the Court's prior rulings or its present analysis of the law before it.

The Court concludes that an accurate formula for calculating back pay starts with Plaintiff's immediate past performance on salary and bonus, so it will look to what she actually earned in her final full pay plan year of 2013 when she met and exceeded her sales goal—$127,278. (Ex. 360; Doc. 234 at 4.) Assuming Plaintiff would at least maintain her then-extant level of performance if unhampered by any discriminatory changes in employment conditions, the Court will apply to that baseline an annual escalator factor of four percent as determined in the Findings Section above. Plaintiff's back pay for the first year after her termination—from March 1, 2014 through February 28, 2015—would thus be $127,278 multiplied by 1.04, or $132,369.12. For the final six months of her back pay award period—from March 1, 2015 through August 31, 2015—Plaintiff's back pay would be the 2014 rate of $132,369.12 multiplied again by the 1.04 escalator, and then divided by 2 to account for the half year term of the award period, resulting in pay back pay of $68,831.94. The lost salary and bonus component of Plaintiff's pack pay award for the entire eighteen month period would be $201,201.06.[6]

Plaintiff also claims as part of her equitable back pay the retirement savings plan benefit she would have received from Defendant during the back pay period, as well as the defined benefit pension program payments reflecting employment through the back pay period, and health insurance benefits for that period. The Court will review each contention in turn.

The Court found above that based on Plaintiff's date of hire with Defendant, she was not eligible for the "retirement contribution feature" of Defendant's defined contribution retirement plan, but that she did qualify for, and participated in, the 401(k) component of the plan that provided for a limited employer match of employee

---

[6] Defendant argues the Court should offset against this amount any income Plaintiff earned since resigning, to include $22,000 she earned through her consulting business. But that amount was earned after August 2015, the point at which Plaintiff's back pay award terminates. Offset is thus not appropriate.

contributions, and was completely vested in that program. Defendant had contributed approximately $3,818 per year in matching funds to Plaintiff's 401(k) retirement program in the two years leading up to her resignation. The Court thus will award as a component of equitable damages $5,727, representing Defendant's expected matching contribution to Plaintiff's 401(k) account for the eighteen month back pay award period. The Court so concludes upon a finding that Plaintiff would have continued her recent historic level of contributory participation in the plan and thus would have qualified for matching contributions from Defendant in this amount.

At the trial on the equitable relief portion of Plaintiff's claim, Plaintiff introduced evidence, which Defendant did not contest, in the form of a letter from Defendant acknowledging that Plaintiff was vested in Defendant's corporate pension plan and eligible to begin drawing on that pension as early as her 55th birthday at an amount not yet calculated. (Ex. 63.) The letter indicated that if Plaintiff deferred drawing on the pension until age 65, she would receive monthly benefits in the amount of $1,801. (*Id.*) That calculation was based on Plaintiff's termination date of February 28, 2014. Based on the Court's ruling that Defendant did not meet its burden of proving all elements of failure to mitigate until the end of August 2015, and that Plaintiff is therefore entitled to the equitable remedy of back pay through that date, the Court similarly will order Defendant to recalculate Plaintiff's monthly payment eligibility upon regular retirement at age 65 under the VF Corporation Pension Plan after giving her credit for employment through August 31, 2015 for plan purposes. Defendant shall also calculate monthly benefit payments for Plaintiff with credit for employment through August 31, 2015, under the early retirement option at age 55.

Plaintiff also seeks to be made whole for health insurance coverage she lost as a result of leaving Defendant. "Where an employee's fringe benefits include medical and life insurance, a plaintiff should be compensated for the loss of those benefits if the plaintiff has purchased substitute insurance coverage or has incurred, uninsured, out-of-pocket medical expenses for which he or she would have been reimbursed under the

employer's insurance plan." *Galindo*, 793 F.2d at 1517. As the Court found above, Plaintiff provided no evidence of any cost of substitute insurance or specific out-of-pocket medical expenses for which she would have been reimbursed under Defendant's plan. She did testify that she had to pay deductibles of approximately $1,500 per year in 2014 and 2015 after she went onto her husband's company's health insurance plan.

The Court concludes Plaintiff failed to prove by a preponderance that she had no deductible, equivalent or otherwise, while covered by Defendant's plan. Plaintiff's initial testimony on direct examination was as follows:

Q: When you were working at Wrangler were you a participant in a health insurance plan?

A: Yes.

Q: Was there a deductible on that plan?

A: I don't believe so.

(Tr. 5/4/17 at 293:6-10.) On cross examination, Plaintiff answered Defendant's counsel's questions on the same topic as follows:

Q: And you mentioned you had deductibles under your health insurance through your husband?

A: Correct.

Q: You also had deductibles on your health insurance when you were employed at Wrangler also, didn't you?

A: I don't recall what they were.

Q: I understand you don't recall what they were; do you recall that there were deductibles?

A: I don't know. I don't remember.

(Tr. 5/4/17 at 299:10-18.) The above testimony is the only evidence on costs of insurance before and after Plaintiff's resignation. It does not constitute proof by a preponderance that Plaintiff had no deductibles under her prior insurance provided by Defendant. The

Court will not include as part of the equitable award an amount for the loss of insurance related amounts.

Plaintiff argues she is entitled to recover interest on the back pay award, citing *Loeffler v. Frank*, 486 U.S. 549, 557-58 (1988). Defendant does not dispute that, if an award of back pay is merited, Plaintiff would be so entitled to interest. The Court will award pre-judgment interest.[7]

Although Plaintiff seeks further injunctive relief in this matter, the Court finds no basis upon which to grant it. Plaintiff has presented to the Court no evidence that Defendant plans to engage in future discriminatory conduct based on sex. Nor has she demonstrated that any other persons require protection by such injunction. Moreover, the cases Plaintiff cites in support of her claim for injunctive relief all involve litigation instituted or joined by the EEOC—a federal agency tasked with enforcing discrimination and other employment laws in the public interest, as opposed to a private plaintiff. The Court declines to enter further equitable relief, injunctive or otherwise.

## III.    ATTORNEYS' FEES

Title VII permits a prevailing party to move for reasonable attorney's fees and costs. 42 U.S.C. § 2000e-5(k); *see also* Fed. R. Civ. P. 54(d). Plaintiff shall file any application for attorney's fees and costs within 14 days of the date of this Order.

---

[7] Plaintiff argues for increasing any award for inflation in the future because "the value of money paid in a lump sum today will lose value over time due to inflation." (Doc. 234 at 10.) In support of this argument, Plaintiff cites *United States v. English*, 521 F.2d 63, 75 (9th Cir. 1975), but does so completely out of context. *English* dealt with lump sum payments reflective of future earnings less personal consumption, and found that a lump sum paid now for future lost earnings net of consumption must be *discounted* to its present value, because it must account for time value of money. In other words, the Ninth Circuit in *English* held the exact opposite of what Plaintiff here contends, and it reversed the district court for failure to so *reduce* the award. *English* goes on to note simply that "courts may take into account future inflationary or deflationary trends." *Id.* The Court declines to do so here, in light of the fact that the award spans a brief duration of only a year and a half, which period already has elapsed.

## IV.  CONCLUSIONS

IT IS THEREFORE ORDERED granting in part and denying in part Defendant's renewed Motion to Limit Plaintiff's Equitable Remedies (Doc. 208).

IT IS FURTHER ORDERED awarding Plaintiff $300,000 in compensatory and punitive damages and $206,928.06 in equitable damages[8] for her Title VII claim of discrimination based on sex. Pre- and Post-judgment interest at a rate of 1.89 percent shall accrue from February 28, 2014.

IT IS FURTHER ORDERED that Defendant shall credit Plaintiff in its VF Corporation Pension Plan as having been employed, at the compensation levels herein awarded, through August 31, 2015, and shall recalculate Plaintiff's monthly payment benefit under the Plan: 1) for regular retirement at age 65; and 2) for early retirement at age 55, under the same rules as applicable to regular employees of Defendant, delivering such calculation results to Plaintiff.

IT IS FURTHER ORDERED that, pursuant to Federal Rule of Civil Procedure 58, the Clerk of Court shall enter judgment accordingly and close this case.

IT IS FURTHER ORDERED that Plaintiff shall file any application for attorneys' fees and costs within 14 days of the date of this Order.

Dated this 23rd day of February, 2018.

Honorable John J. Tuchi
United States District Judge

---

[8] Comprised of $201,201.06 in back pay for the period March 1, 2014 through August 31, 2015, and $5,727 in matching contributions to Plaintiff's 401(k) account that Defendant would have made over the same period.